JASON H. LEE (Cal. Bar No. 253140)
JASON M. BUSSEY (Cal. Bar No. 227185)
bussey j@sec.gov
MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)
meyerhoferm@sec.gov
ANTHONY J. MORENO (Cal. Bar. No. 299220)
morenoa@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 700
San Francisco, CA 94104
(415) 705-2500 (Telephone)
(415) 705-2501 (Facsimile)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM SARRIS and JOSEPH ENDOSO,<br><br>Defendants. | Case No. 5:26-cv-11675<br><br>**COMPLAINT**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

**SUMMARY OF THE ACTION**

1. From at least June 2021 to July 2024, William Sarris, the founder and CEO of San Jose-based Linqto, Inc. ("Linqto"), with assistance from another Linqto officer, Joseph Endoso, misled and deceived investors who used Linqto's online platform to invest in pre-IPO "unicorn" companies. From at least January 2021 to December 2024, Sarris and Endoso (collectively, "Defendants") were also responsible for Linqto's failure to register its investment offerings with the SEC.

2. At all relevant times, Linqto's business model worked as follows: Linqto's subsidiary, Linqto Liquidshares, LLC ("Liquidshares"), acquired equity stakes in privately held companies, allocated economic interests in that equity to special purpose vehicles ("SPVs"), and sold units in the SPVs to retail investors via Linqto's online platform. Linqto promoted these offerings on its website, in emails, and through social media.

3. Linqto and Liquidshares profited by selling SPV units to investors at higher prices—often *much* higher prices—than what Liquidshares had paid to acquire the underlying equity. With this business model, from 2021 to 2024, Liquidshares sold over $430 million of SPVs to thousands of retail investors located in the Northern District of California and throughout the United States, generating more than $160 million in total revenue.

4. Sarris and Endoso capitalized on the limited information available to retail investors about the value and availability of private company securities by using various deceptive statements and practices, all designed to maximize Linqto's profits. For example, in 2022, to generate additional sales, Linqto boasted to investors that the prices on its platform reflected current market conditions or below-market prices. In fact, the company's contemporaneous internal analyses showed that almost all its offerings were priced higher than fair value and that some of the most popular were *several times* above that benchmark.

5. Sarris and Endoso also misled investors about the availability and scarcity of the private company shares sold on Linqto's platform. By June 2021, Linqto adopted a regular practice of periodically removing SPV units for certain companies from its platform and telling investors the units for those companies were "sold out" or "fully subscribed," when, in reality, Linqto still had additional shares available to sell. The objective, in Sarris's words, was to create a "feeding frenzy" among investors by making it seem as if the units were in short supply so investors would rush to buy them when Linqto again made them available.

6. Beginning in April 2023, Linqto started deceiving investors in yet another way: it claimed to be launching a feature whereby certain SPV unit prices would rise and fall dynamically based on investor demand. However, until late May 2023, Linqto personnel continued to set prices manually. Internally, Sarris admitted he was acting as "a little Wizard of Oz," adding "don't pay

attention to the man behind the screen." Even after the algorithm became operational in late May 2023, Sarris exercised substantial control over SPV unit prices, making Linqto's claims about dynamic pricing false or misleading.

7. Sarris and Endoso touted the purported legal compliance of Linqto's business in marketing materials sent to investors while at the same time deliberately flouting the federal securities laws. Thus, in December 2022, a Linqto employee, at Sarris's direction, assured investors that Linqto had "taken zero shortcuts" and was "meeting all relevant SEC and IRS requirements." And in March 2023, Endoso approved an email to investors claiming that: "At Linqto, your trust is our most important asset. That's why we have taken the time and resources to become Federally regulated and compliant…."

8. When those statements were made, however, Sarris and Endoso had been told that Linqto's business violated federal securities regulations. Although Linqto's SPVs qualified as "investment companies" under the Investment Company Act of 1940, Sarris and Endoso refused to register them as such, thereby disregarding advice they received from Linqto's outside counsel in 2020, in 2021, and again in 2023. Sarris responded to that advice by telling Linqto employees not to worry because Linqto would just "pay the fine" if its violations were discovered. Likewise, from September 2023 to at least January 2024, Sarris and Endoso unlawfully sold SPV units through Liquidshares to non-accredited investors in unregistered transactions without a valid exemption.

9. Sarris and Endoso personally profited from the unlawful securities sales facilitated by their misconduct, as each received bonuses whose size was determined in part by Linqto's financial performance. Sarris separately profited by arranging for a venture capital fund to purchase Linqto common stock from Sarris's wife and then resell that stock to Linqto investors (in the form of SPV units) via Linqto's platform.

10. As a result of the conduct alleged in this complaint, Defendants violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)]; Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Defendants also aided and abetted Linqto's violations of Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], as well as the SPVs' violations of Section 7(a) of the Investment Company Act of 1940 ("Investment Company Act") [15 U.S.C. § 80a-7(a)]. Sarris is further liable for Linqto's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] as a control person of Linqto.

11. The SEC respectfully requests that the Court enter Judgments against Defendants imposing injunctive relief, barring Defendants from serving as officers or directors of public companies, and ordering Defendants to disgorge their ill-gotten gains, with prejudgment interest, and to pay civil monetary penalties.

**JURISDICTION AND VENUE**

12. The SEC brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]; and Sections 42(d) and (e) of the Investment Company Act [15 U.S.C. §§ 80a-41(d) and (e)].

13. This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v]; Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa]; and Section 44 of the Investment Company Act [15 U.S.C. § 80a-43].

14. Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint. For example, both Defendants sent and approved multiple emails to investors as set forth in paragraphs 45-51, 57, 60, 63, 65, 68, 75, 101, and 104 below. Those investors were located in multiple states.

15. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 44 of the Investment Company Act [15 U.S.C. § 80a-43]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. At all relevant times, Linqto's principal place of business was in San Jose, California, and Sarris and Endoso also both resided in the Northern District of California.

16. Under Civil Local Rule 3-2(c), this civil action should be assigned to the San Jose Division because a substantial part of the events and omissions which give rise to the claims alleged herein occurred in Santa Clara County and Monterey County.

**DEFENDANTS**

17. William Sarris, age 75, is a resident of Monterey, CA. Sarris founded Linqto in 2009 and served as its Chief Executive Officer at all times from then until January 2, 2025, except from February 2024 to August 2024. He was a member of Linqto's Board of Directors from January 2010 until at least March 2025.

18. Joseph Endoso, age 66, is a resident of Ross, CA. Endoso was in charge of customer service at Linqto and at various times held the titles of Chief Financial Officer, Chief Revenue Officer, and President. He also served as Linqto's Chief Executive Officer from February 2024 to August 2024. He was a member of Linqto's Board of Directors from November 2019 to January 2025. At various times since August 2003, Endoso has been a registered representative of several SEC-registered broker-dealers.

**RELATED ENTITIES**

19. Linqto, Inc. is a private Delaware corporation that was incorporated in 2009 and which, while operational, had its principal place of business in San Jose, CA. In July 2025, Linqto filed for Chapter 11 bankruptcy.

20. Linqto Liquidshares, LLC is a Delaware limited liability company and wholly owned subsidiary of Linqto that was created in 2020 and which, while operational, had its principal place of business in San Jose, CA. In July 2025, Liquidshares filed for Chapter 11 bankruptcy.

21. Each Liquidshares SPV was a separate "series" associated with Liquidshares. Under Delaware law, each "series" associated with a limited liability company has the characteristics of a separate limited liability company, including the ability to hold assets and liabilities that are segregated from the assets and liabilities of other series.

## FACTUAL ALLEGATIONS

### A. Linqto's Business

22. From February 2020 until March 14, 2025, Linqto operated an online platform that offered investors the opportunity to invest indirectly in privately owned companies, including well known "unicorns," *i.e.*, privately held companies valued at over $1 billion. Linqto had the stated goal of providing "ordinary accredited investors with speedy, low-cost, and easy access to shares of private companies." One of the private companies available on Linqto's platform was Linqto itself.

23. Liquidshares used multiple methods to purchase the securities of privately owned companies. In most cases, it purchased securities directly from employees and early investors of those companies. In other instances, Liquidshares instead acquired equity in funds that held private company securities. In both cases, Liquidshares then allocated economic interests in the securities to SPVs. Each SPV had an economic interest in a single underlying private company.

24. Linqto advertised its SPVs to potential investors through its public website and smartphone application, through marketing emails, and through social media influencer campaigns.

25. An investor could purchase units of an SPV by creating an account on Linqto's platform. When an investor invested through Linqto's online platform, the investor paid money to Liquidshares and received in exchange units in an SPV that held an economic interest in the relevant private company. Linqto represented to investors that these SPV units corresponded on a 1:1 basis to private company shares.

26. Investors reasonably expected that their money would be pooled with that of other investors and used to acquire the securities of the selected private company and that, when the underlying private company was acquired or went public, they would share in the value of the underlying private company securities in proportion to their ownership of SPV units. Investors also reasonably expected that their investments were passive and that any profits would come from the

work Liquidshares and its managers did to create and manage the SPVs, including by obtaining the securities of the private companies held in the SPVs.

27. Linqto and Liquidshares generated profit by selling SPV units for more than Liquidshares had paid to obtain the underlying private company securities. Liquidshares charged markups that often exceeded 50% and even 100% of its own cost. Linqto disclosed that it sold private company securities at a markup, but it did not tell investors how large its markups were.

28. Unlike publicly traded stocks, whose market prices are discernable from public quotations, the value of private company shares is generally not readily ascertainable by retail investors. Consequently, it was difficult for Linqto's investors to determine whether Linqto was offering private company investments at market prices.

29. Linqto promoted SPV units by sending marketing emails to potential investors. Sometimes, as alleged more specifically below, Sarris sent marketing emails directly to investors. Even when he did not send them himself, Sarris was generally in charge of marketing email content and decided on the topics for marketing emails, as in other examples alleged specifically below. Sarris also generally directly edited marketing emails sent by others and decided whether to accept or reject suggestions made by other Linqto personnel.

30. From 2021 to 2024, Liquidshares continuously sold SPV units by means of Linqto's platform, making total sales of more than $430 million.

31. As Linqto's CEO, Sarris had the authority to hire and fire Linqto personnel. He also supervised Linqto's other senior executives.

## B. Sarris's and Endoso's Incentives to Boost Sales

### *i. Sarris Owned a Significant Amount of Linqto Stock*

32. As Linqto's founder and longtime CEO, Sarris was, at all relevant times, one of the largest holders of Linqto's common stock. He accordingly stood to profit substantially if Linqto was acquired or went public. Sarris likewise had an incentive to boost Linqto's sales and profits to make it a more attractive acquisition target.

*ii. Sarris and Endoso Received Bonus Compensation Based on Linqto's Financial Performance*

33. Sarris and Endoso each also had an economic incentive to increase sales due to their participation in Linqto's bonus program. From around September 2021 until August 2022, Endoso was paid an annual bonus out of a bonus pool that was established for all Linqto sales employees. The pool was set at 5% of the volume of all sales of SPV units per quarter. Sarris determined how much of the available funds would be paid to Endoso, and Endoso allocated the remaining funds in the pool among Linqto's sales personnel.

34. Between August 2022 and the first quarter of 2023, Linqto changed its compensation structure. During that time, Endoso continued to receive a salary and a discretionary quarterly bonus; however the available bonus pool for all eligible employees changed to up to 1% of total sales of SPV units per quarter.

35. In the first quarter of 2023, Linqto switched to a companywide bonus pool that was set at 10% of Linqto's adjusted EBITDA and was distributed to employees according to a formula that was pro rata based on the relative sizes of their salaries. Sarris and Endoso both participated in this bonus pool. Sarris stopped participating in the companywide bonus pool in October 2023. Endoso participated in the bonus pool until at least September 2023.

36. Accordingly, during the foregoing periods (from at least around September 2021 to September 2023 for Endoso and from at least the first quarter of 2023 until October 2023 for Sarris), the amount of Endoso and Sarris's bonuses were determined in part by the volume and the prices of the SPV units that Liquidshares sold. Endoso and Sarris each therefore obtained money by means of the false and misleading statements and omissions described below.

*iii. Sarris Benefitted from the Sale of 2,000,000 Shares of Linqto Common Stock*

37. Sarris separately benefitted from the sale of Linqto common stock. On or about March 27, 2023, Sarris proposed to a venture capital firm (the "Venture Capital Firm") that the firm should purchase 2 million shares of Linqto common stock at $2.00 per share from Sarris's wife (to whom Sarris had been married since before Linqto's formation) and then resell those shares to investors on Linqto's platform at or above $2.75 per share.

38. On or about March 30, 2023, the Venture Capital Firm and Sarris's wife entered into an agreement pursuant to which the Venture Capital Firm would purchase 2,000,000 shares of Linqto common stock at $2.00 per share from her, for $4,000,000 total. In partial performance of this agreement, the Venture Capital Firm paid Sarris's wife $2,000,000 and acquired 1,000,000 shares.

39. From April 4, 2023 to July 30, 2023, the Venture Capital Firm sold units of SPVs holding the shares purchased from Sarris's wife to investors on Linqto's platform at prices from $2.26 to $4.00 per unit.

40. On or about July 20, 2023, Linqto's Board of Directors ratified Sarris's wife's sale of 1,000,000 shares of Linqto common stock to the Venture Capital Firm for $2,000,000 and caused Linqto to exercise its right of first refusal as to the remaining 1,000,000 shares that Sarris's wife had agreed to sell to the Venture Capital Firm.

41. On or about August 21, 2023, Linqto and Sarris's wife executed an agreement pursuant to which Sarris's wife sold the remaining 1,000,000 shares of Linqto common stock to Liquidshares for $2,000,000.

42. Liquidshares sold Linqto SPV units to investors on Linqto's platform on a daily or near-daily basis throughout the July 2023 to December 2023 period at prices ranging from $1.40 to $5.44 per unit.

43. As a result of these transactions, Sarris's marital estate—and therefore Sarris—obtained $4,000,000.

### C. Sarris, Endoso, and Linqto Made False and Misleading Statements About Selling SPV Units at Fair or Market Value

44. In the summer of 2022, Sarris and Endoso, in an apparent effort to deceive investors into overpaying for SPV units, falsely claimed to investors that the SPV units on Linqto's platform were being offered at "current market" or "below market" prices.

45. On July 11, 2022, Endoso emailed Linqto's Director of Digital Asset Sales directing him to "please send out an email" to a group of investors who had previously invested large amounts of money through Linqto's platform, known as "Team Apollo," alerting them to

Linqto's prices for SPV units for Company 1, a popular blockchain company. Endoso indicated that the email should highlight particular prices—which ranged from $32 to $44 per unit, depending on the quantity purchased—and state that those prices "reflect[] current market conditions."

46. Beginning the next day, July 12, 2022, the Director of Digital Asset Sales separately sent dozens of emails to individual "Team Apollo" investors advertising the same prices previously identified by Endoso. As Endoso had instructed, these emails also represented that the specified prices "reflect[] current market conditions." At least one investor purchased Company 1 SPV units after receiving such an email.

47. As Endoso knew, or was reckless in not knowing, the emails he directed the Director of Digital Asset Sales to send were false and misleading. On June 24, 2022, Linqto's Director of Origination and Markets had emailed Endoso a spreadsheet showing that Liquidshares acquired its Company 1 shares at $25.50 per share and that their "Fair Value" as of June 23, 2022 was $23 per share, 28% to 48% lower than the prices set forth in Endoso's July 11, 2022 email. In the email attaching the spreadsheet, the Director of Origination and Markets flagged that very disconnect, warning: "Our elevated sellside pricing currently stands in stark contrast to the underlying value of these stocks." He further warned that "particularly when retail buyers are involved," Linqto's pricing "runs the risk of attracting negative attention."

48. On August 24, 2022, Sarris sent a marketing email to potential investors advertising that Linqto had been "investing in new companies and making additional investments in current companies." The email further represented that Linqto would "continue to 'buy low'" and that "These lower price points materialize on the Linqto platform as offers priced at what we believe are 'below market' valuations." Sarris specifically called out several companies in his email, including Company 1, and Company 2, which offers a digital wallet and trading platform. Multiple investors who received this email then purchased SPV units on Linqto's platform.

49. Sarris's claim that the offers on Linqto's platform were priced at "'below market' valuations" was false and misleading. Ten days earlier, on August 14, 2022, Linqto's Director of Origination and Markets emailed an updated spreadsheet to Endoso and others showing, for

various private company securities available on Linqto's platform, both Linqto's current offering price and the "Fair Value." According to the spreadsheet, with just one exception, Linqto was selling every security on its platform at above what Linqto determined to be "Fair Value."

50. In most cases, the difference between Linqto's price and "Fair Value" was stark. For example, the spreadsheet identified the "Fair Value" of Company 1 as $20 per share, whereas Linqto's "Platform Offer Price" was $44. The contrast was even greater for Company 2, whose "Fair Value" and "Platform Price" were $1.75 and $7.50, respectively. Thus, in his August 24, 2022 email, Sarris described as "'below market' valuations" prices that were more than two to four times higher than Linqto's internal assessment of the "Fair Value" of the same securities.

51. Sarris knew or should have known that, contrary to what he wrote in his August 24, 2022 email, Linqto was not offering SPV units at "'below market' valuations." The August 14, 2022 email comparing Linqto's prices to "Fair Value" was sent to Endoso, who was at the time Sarris's direct report and with whom Sarris discussed pricing. Moreover, since Sarris's representation about "'below market' valuations" was contradicted by Linqto's own contemporaneous "Fair Value" analysis, Sarris lacked a reasonable basis for the claims he made in the August 24, 2022 email.

52. A reasonable investor would have considered it important to know whether the SPV units on Linqto's platform were being sold to them at or below fair value or, instead, reflected consistent and substantial markups that in some cases exceeded 400%.

### D. Sarris, Endoso, and Linqto Deceived Investors Into Believing That SPV Unit Prices Were Directly Set By Supply And Demand

53. By April 2023, Linqto began developing a "dynamic pricing" algorithm that ostensibly would control the prices at which investors could buy or sell SPV units on Linqto's platform. The algorithm calculated prices using a complex equation with several variables. The algorithm was designed to raise and lower prices in response to investors' purchases and sales of SPV units.

54. At the end of March 2023, the algorithm was still under development and was not being used to set prices on Linqto's platform. However, Sarris decided to begin promoting the concept of dynamic pricing to investors.

55. In a March 30, 2023 chat conversation, Sarris told Endoso and another Linqto employee that the following Monday, April 3, needed to be a "Spike Day for Linqto," meaning a day when Linqto would focus on selling Linqto SPV units. Sarris said that Linqto "should discuss dynamic pricing that could rise or fall many times daily, based on supply and demand."

56. In the same conversation, Sarris indicated that Linqto should manually adjust the price of Linqto SPV units to create the appearance of a price fluctuating organically in response to market forces. Specifically, Sarris wrote that Linqto SPV units "should launch with a set price (probably $4.00) and we will adjust it regularly so they [investors on Linqto's platform] can experience the price changes often enough to check back regularly."

57. On April 3, 2023—just days after Sarris's wife agreed to sell Linqto stock to the Venture Capital Firm and one day before the Venture Capital Firm began selling Linqto SPV units to investors—Sarris sent a marketing email to potential investors that claimed: "Beginning today, the price of Linqto shares will rise and fall based on market demand. The price will fluctuate with trading activity." Endoso approved a second version of this email that was sent to the Team Apollo investors the same day. The same day, Sarris confirmed in a chat message to another Linqto employee that, in fact, and contrary to the marketing email, "today we are doing market making manually." Multiple investors who received Sarris's email and multiple recipients who received Endoso's email then purchased units of SPVs with an economic interest in Linqto.

58. As Sarris and Endoso knew, or were reckless in not knowing, it was false and misleading to claim in April 2023 that the price of Linqto SPV units would "rise and fall on market demand." Both Sarris and Endoso knew that Linqto was at that time manually setting the prices at which SPV units were offered for purchase and sale.

59. As Sarris knew, or was reckless in not knowing, it was also deceptive for Linqto to manually adjust the prices of Linqto SPV units on its platform in April 2023 to create the

appearance of market-driven pricing when, in reality, Linqto was still at that time manually controlling the prices at which it offered SPV units.

60. On April 25, 2023, Endoso sent a marketing email stating that the next day, Linqto would "be doing a soft launch of our private market trading system by running a test on [Company 3]. For the first time, you'll be able to buy and sell [Company 3] at prices determined by actual supply and demand on our platform. Pricing will be dynamically set through an algorithmic engine that we've adapted from one used by a leading decentralized crypto exchange." Multiple investors who received this email then purchased units of SPVs with an economic interest in Company 3.

61. But as Endoso knew, or was reckless in not knowing, this was false. At this time, Linqto was setting the prices on its platform manually, and there was no "algorithmic engine" controlling the prices at which Company 3 SPV units were offered for purchase or sale. Instead, as Sarris put it in an April 25, 2023 conversation with Endoso, the pricing was controlled by "a little Wizard of Oz… don't pay attention to the man behind the screen." In a further message in the same conversation, Sarris wrote, "we're in control of the manipulation, so no outsider can take advantage. we will guarantee small swings ... or shall we say 'appropriate' swings."

62. On or about May 22, 2023, Linqto enabled its "dynamic pricing" algorithm to set the prices at which Company 1 SPV units would be offered on its platform.

63. On May 22, 2023, Sarris sent a marketing email to potential investors with the headline: "Introducing Market Pricing" and the subtitle "the price of [Company 1] now determined by supply and demand." The email stated: "Today, Linqto is opening [Company 1] to Market Pricing. To first determine Market Value, we have supplied the platform with shares from our treasury at $20, which represents the lowest price it has been at. Buy orders will automatically raise the price for the ensuing transaction. Supply and demand will determine Current Market Price." Multiple investors who received this email then purchased units of SPVs with an economic interest in Company 1.

64. By June 19, 2023, Linqto also enabled its dynamic pricing algorithm to set prices for Company 2 SPV units, Company 3 SPV units, and Linqto SPV units.

65. On June 19, 2023, Linqto sent a marketing email to potential investors with the headline "Market Pricing on Linqto." In the email, Linqto wrote that it "has been thrilled to bring its investors a unique opportunity through the adopting of market-driven pricing for four formidable companies: [Company 1, Company 2, Company 3], and our own Linqto. This strategy has opened up a dynamic market for our members, not only enabling them to buy but also to sell shares of these companies." Multiple investors who received this email then purchased units of SPVs with an economic interest in Company 1, Company 2, Company 3, or Linqto.

66. As Sarris knew, or was reckless in not knowing, the May 22, 2023 and June 19, 2023 marketing emails were false and misleading because, throughout this period, Sarris exerted significant direct control over the prices on Linqto's platform. For example, on June 7, 2023, Sarris instructed a Linqto programmer to adjust the dynamic pricing algorithm's variables so the algorithm would have slower upward and faster downward price movements. In the same conversation, Sarris told the programmer that the current price of Company 1 SPV units on the platform, $63.70, was too high, and they should lower it to around $56. Sarris, Endoso, and others also had discussions in June and July 2023 about how they could cause the dynamic pricing algorithm to lower an SPV unit price by a particular amount by controlling how many additional units they added to the platform.

67. By September 19, 2023, Sarris had begun directly adjusting the dynamic pricing algorithm's inputs, sometimes multiple times a day.

68. On September 21, 2023, Linqto sent what appears to be a marketing email to many potential investors promoting Linqto SPV units. The email was worded like an advertisement, it included what appear to be professionally formatted graphics, it contained multiple hyperlinks to Linqto's website, and it ended with a lengthy legal disclosure.

69. Among other things, the email stated, "You too can participate in the benefits of our explosive growth. How many private companies today are showing exponential growth of profitable revenue? *Price on the platform is set by the Linqto membership according to supply and demand*, *similar to our other offers* and is not a reflection of the valuation when it goes public." (emphasis added). During the week after Linqto sent this email, dozens of investors bought units of

SPVs holding an economic interest in Linqto, and hundreds of investors bought other SPV units on Linqto's platform.

70. As Sarris knew, or was reckless in not knowing, it was false and misleading for Linqto to claim that the price of Linqto SPV units was "set by the Linqto membership according to supply and demand." By September 21, 2023, Sarris was actively manipulating the dynamic pricing algorithm to increase the amount of money that Linqto made from sales of SPV units that were ostensibly set organically by supply and demand.

71. A reasonable investor would have considered it important to know whether the SPV unit prices on Linqto's platform were set according to genuine market supply and demand. A reasonable investor could have concluded from the false appearance of market-driven pricing on Linqto's platform that the prices offered on the platform were competitive and determined by market forces, whereas those prices were actually controlled by Linqto, regardless of whether they were competitive or not.

**E. Sarris, Endoso, and Linqto Deceived Investors by Creating an Illusion of Scarcity**

72. On June 10, 2021, Sarris emailed Endoso describing a scheme to drive up sales of SPV units by creating the false perception that they were scarcer and selling more quickly than they really were. Sarris explained that Linqto had taken SPV units for Company 2 down from its platform "so people would see it sold out for 3 days." Sarris said that when Linqto re-launched those units, they sold out in just an hour and a half, after having previously been available for two weeks.

73. Sarris decided to make temporary removal of SPV units from Linqto's platform a recurrent sales tactic. In his June 10, 2021 email, he further wrote: "This is a process we can now start planning, instead of letting it happen organically. Especially for high profile products. We had [a prominent crypto company] on the platform for a while and the last sale was last week. I just took that one down… as Sold Out. That will be one of our re-launches next week. Lesson learned is that even if we have lots of inventory of a particular company, we should plan launches with just enough of it so it sells quickly and then launch another batch after some dark period." (ellipsis in original).

74. The objective of this sales tactic was, in Sarris's words, to create a "feeding frenzy" among investors, creating a false appearance that SPV units were in short supply so investors would rush to buy them when they were available.

75. Pursuant to Sarris's plan, until at least July 2024, Sarris, Endoso and others at Linqto periodically made certain private companies on its platform unavailable for purchase even when the company had shares of those companies available to sell. During these periods of unavailability, Linqto's platform typically showed that shares in such companies were "sold out" or "fully subscribed." For example:

a. On the morning April 21, 2022, Endoso wrote Sarris, saying: "let's throttle [Company 1] supply back today and have enough to run out by noon or thereabouts." Agreeing, Sarris responded, "then it goes dark and then back up late tonight?" Endoso replied, "Yes please."

b. On March 8, 2023, Endoso, Sarris, and other Linqto personnel discussed in a group chat how Company 1 was now "fully subscribed" on Linqto's platform, even though Linqto had additional shares available to sell. Endoso said: "We can release more [Company 1] later today but first we should let the message sink in that the small block was fully sold out at the lower price. We need to continue shifting investor psychology towards viewing [Company 1] as a scarce asset that's becoming more expensive--not like water that will always be there whenever you want to turn your tap on." Sarris agreed that "[w]e will 'go dark' this evening if they don't sell on their own, and put the higher price lot up tomorrow to create the continued FOMO."

c. On November 17, 2023, Linqto's Chief Operating Officer told Sarris and Endoso that she and Linqto's Chief Marketing Officer recommended "letting [Company 4] stay sold out and relaunching next week" so Linqto could "use it as an opportunity to tease over the weekend that we will be launching more [Company 4] shares next week." In the same group chat, Sarris told Endoso and others that "there are still 666,667 [Company 4] shares in Assets" available to sell.

Nevertheless, the following day, November 18, 2023, Linqto sent a marketing email to potential investors stating, "After having been sold out, [Company 4] will soon be available again for investment on Linqto." On November 21, 2023, Linqto sent another marketing email to potential investors stating, "After having been sold out, [Company 4] is available again on the Linqto platform!" These emails had the appearance of mass emails with a large distribution. They were worded like advertisements, they used what appear to be professionally formatted graphics, they contained multiple hyperlinks to Linqto's website, and they included a lengthy legal disclosure at the bottom. More than 20 investors purchased SPV units holding an economic interest in Company 4 during the week after these emails were sent.

d. On July 15, 2024, Sarris told Endoso that Linqto was "going dark on [Company 5]," even though Linqto still had Company 5 shares available to sell, as part of a plan to promote Company 5 units two days later. Consistent with Sarris's plan, Linqto's platform subsequently indicated to investors that the shares of Company 5 were "fully subscribed." After making Company 5 available for investment again on July 17, Linqto sent prospective investors an email stating: "[Company 5] is available again on the platform. Thanks to the new supply available, pricing will start at $50/share for a $10,000 investment."

76. In these and similar instances, it was misleading for Linqto, at the direction of Sarris and Endoso, to show or describe certain companies as "sold out" or "fully subscribed," when Linqto had additional shares of those companies available to sell to investors at all relevant times. In context, a reasonable investor would have understood "sold out" or "fully subscribed" to mean that, for some time, Linqto did not have any shares remaining in its inventory to sell to investors.

77. A reasonable investor would have considered it important to know whether Linqto had in fact sold all the securities that it had available for a private company. Representations that particular SPV units are "sold out" or "fully subscribed" indicate to a reasonable investor that the

prices at which Linqto was offering those shares were viewed as attractive by other investors. Those representations also indicate to a reasonable investor that the demand for the applicable companies' securities exceeded the supply, and that the shares available for purchase were scarcer than they actually were.

### F. Liquidshares, at Sarris's and Endoso's Direction, Unlawfully Offered and Sold Securities in Unregistered Transactions

78. The offers and sales of SPV units that Liquidshares sold to investors on Linqto's platform were not registered with the SEC under the Securities Act.

79. Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] generally prohibit the unregistered offer and sale of securities. However, certain offers and sales are exempt from this requirement.

80. Prior to September 2023, Linqto purported to meet the requirements of Securities Act Rule 506(c) [17 C.F.R. § 230.506(c)], which, subject to certain requirements, allows unregistered sales of securities to "accredited investors." For example, in October 2021, Linqto's website responded to the FAQ, "Do I have to be an Accredited Investor" with: "Yes. Per US regulations, all of our investors must be accredited." Accredited investors include individuals who satisfy certain specified net worth, income, professional, or educational criteria.

81. However, beginning in September 2023 and continuing to at least January 2024, Sarris and Endoso decided that, in order to increase both revenue and the number of investors on Linqto's platform, Liquidshares would sell SPV units to investors who were not "accredited investors." In a September 11, 2023 internal chat conversation, a Linqto employee asked if the offering to non-accredited investors would "go live" then next day, and Linqto's Chief Operating Officer responded, "[S]tarting tomorrow a non-accredited Investor will be able to go through the flow." Liquidshares ultimately sold SPV units to thousands of non-accredited investors.

82. In offering SPV units to non-accredited investors, Sarris and Endoso purported to rely on a different registration exemption, Securities Act Rule 506(b) [17 C.F.R. § 230.506(b)]. However, Rule 506(b) does not permit offers and sales of securities by means of "general solicitations," which includes the use of both public websites and advertisements directed at

prospective investors. As Sarris and Endoso knew, before, during, and after the September 2023 to January 2024 period, Linqto maintained a public website where it advertised its platform and the specific SPV units available for investment.

83. Linqto's Chief Compliance Officer repeatedly raised concerns to Sarris about Linqto's sales of SPV units to non-accredited investors. Moreover, in October 2023, Sarris and Endoso received a memorandum from Linqto's outside legal counsel recommending that Liquidshares "immediately terminate all pending Rule 506(b) offerings to non-accredited investors and cease any future 506(b) offerings." The memorandum concluded that the offerings to non-accredited investors beginning September 2023 would likely be viewed as a continuation of its previous offerings to accredited investors made with general solicitations, which would make the Rule 506(b) exemption unavailable.

84. Even after receiving this legal advice, Sarris and Endoso continued to permit Liquidshares to sell SPV units to non-accredited investors.

### G. Sarris and Endoso Ignored Legal Advice and Unlawfully Operated Liquidshares's SPVs as Unregistered Investment Companies

85. Liquidshares's SPVs were issuers engaged primarily in the business of investing in securities. They therefore met the definition of an "investment company" under Section 3(a) of the Investment Company Act.

86. Liquidshares's SPVs were not registered with the SEC at any relevant time.

87. Section 7(a) of the Investment Company Act prohibits investment companies that are not registered with the SEC from, among other things, offering, selling, purchasing, or redeeming securities. However, Section 3(c)(1) of the Investment Company Act excludes from the definition of investment company "any issuer whose outstanding securities (other than short-term paper) are beneficially owned by not more than one hundred persons and which is not making and does not presently propose to make a public offering of its securities."

88. At all relevant times, Liquidshares typically capped each SPV at under 100 investors. If more than 100 investors wanted to invest in a single underlying private company and Liquidshares had sufficient shares of the underlying company to satisfy this demand, Liquidshares

circumvented the 100-investor limit by creating one or more duplicate SPVs to hold shares in the same underlying private company. Liquidshares followed this practice for over a dozen companies, including Company 1, Company 2, Company 3, and Linqto itself. In some cases, the total number of investors with interests of a particular private company far exceeded 100, as it did with Company 1, whose SPV units Liquidshares sold to thousands of individuals.

89. Since the SPVs associated with each underlying company were materially identical to each other, they should have been grouped together for purposes of counting toward the 100-investor limit. Moreover, Sarris and Endoso knew that Linqto advertised the SPVs on its public website. Consequently, Liquidshares's SPVs could not avail themselves of the Section 3(c)(1) exclusion for companies with 100 or fewer investors that are not making and do not presently propose to make a public offering of their securities.

90. Based on advice they received from multiple lawyers, Sarris and Endoso knew, or were reckless in not knowing, that many of Liquidshares's SPVs were not excluded from the definition of investment company or exempt from registration under the Investment Company Act. On September 29, 2020, Linqto's outside counsel sent an email to Endoso and another Linqto employee stating that there would be a "100 person limit…to avoid the SPV being an investment company required to register."

91. On January 10, 2021, Endoso received an email from a different outside counsel at a different law firm attaching a draft memorandum about "investment company and investment adviser issues." Among other things, the memo warned that "the SEC may … determine that the offerings should be integrated with the number of total investors as a result exceeding one hundred, making [the] Section 3(c)(1) exemption from the Investment Company Act unavailable." The following day, January 11, 2021, Endoso forwarded the same memo by email to Sarris, noting that it "address[es] regulatory aspects of…our SPV (is it exempt for registration under the Investment Company Act)." Sarris responded by email that same day, indicating he had read the memo.

92. On March 18, 2021, Endoso told Sarris: "It's going to get more fun when we do our first settlement with the SEC and pay our first fine later this year. Early discussions with SEC staff by [our outside counsel] looks like we'll end up having our SPVs tagged as exempt

investment companies . . . . So we'll end up registering as such but will be fined for our past activity." In a further message to Sarris, Endoso estimated that the fines would be about $150,000. Sarris responded that a $150,000 fine was "not so bad," since Linqto expected to realize $2 million in revenue just that month.

93. Despite knowing that they were likely violating the law by doing so, Endoso and Sarris both decided Liquidshares would create additional SPVs for each underlying company whenever an individual SPV would otherwise exceed 100 investors. Sarris and Endoso viewed registering the SPVs under the Investment Company Act as incompatible with Linqto's business model due to delays associated with the registration process and disclosures required by the SEC, including as to Linqto's costs.

94. Moreover, Sarris and Endoso sent and approved emails soliciting investments in SPV units after January 2021, when they became aware that SPVs with more than 100 individual investors were likely not excluded or exempt from registration under the Investment Company Act. For example, as described in paragraphs 45, 48, 63, and 65, Sarris and Endoso sent and approved emails soliciting investments in Company 1 on various occasions from at least July 2022 to June 2023. Throughout this period, Sarris and Endoso were aware that well over 100 different investors held units of SPVs that had economic interests in Company 1.

95. Sarris repeatedly expressed the view that, instead of ensuring that it complied with the Investment Company Act, Linqto should simply press ahead with its sales strategy and deal with the consequences later. For example, when Endoso reminded Sarris on October 1, 2021 that Linqto's outside counsel had advised that "every series for any issuer would get counted as a single entity," Sarris responded: "Doesn't matter what attorneys and accountants tell us… have not found anyone that knows what we do so how can they advise? We will do it in a way that makes sense and it [*sic*] three years from now they tell us we should have done it differently we will pay the fine."

96. On October 17, 2023, a third outside law firm advising Linqto sent Sarris and Endoso a memorandum reaching the same general conclusions that Linqto's previous outside legal counsel had provided them in 2021. The memorandum found it was "highly likely that the SEC

would integrate each Series that has the same underlying Private Securities," which "would have serious and significant regulatory implications for Linqto's business" because "each Series would no longer be able to avail itself of the Section 3(c)(1) exclusion."

97. In October 2024, Linqto's general counsel drafted a formal memo to Sarris stating that "Because many of our SPVs own identical underlying securities, the SEC is likely to…determin[e] the SPVs are unregistered investment companies," and that "we need to stop selling additional SPVs owning identical underlying securities."

98. Despite this advice, at Sarris's and Endoso's direction, Liquidshares continued, through at least December 2024, selling SPV units of particular companies to more than 100 investors through SPVs that were not registered under the Investment Company Act.

### H. Sarris, Endoso, and Linqto Made Misleading Statements About Linqto's Legal Compliance

99. In November 2022, a well-known crypto asset exchange abruptly collapsed and filed for bankruptcy. The collapse generated intense media attention on the crypto asset industry and crypto asset-related companies.

100. On December 18, 2022, Sarris emailed a Linqto employee suggesting that "with all the recent bru-ha-ha surrounding [the crypto asset exchange collapse], Linqto could juxtapose our business with the latest scandals by pointing out to our members the extra distance we went to be in full compliance instead of taking the shortcuts that many others in the crypto space have taken." Sarris claimed in his email that "Linqto does business [in] full engagement with regulatory agencies instead of spending time trying to avoid them or develop workarounds." The employee responded that he would make Sarris's message "the core" of an email he would send the next day to investors on Linqto's platform and that he would "incorporate it [Sarris's message] into the overall Linqto pitching."

101. The following day, December 19, 2022, Linqto sent a marketing email to potential investors claiming: "Since our inception, we've been collaboratively engaged with regulatory agencies instead of spending our time trying to avoid them or develop workarounds. We've taken zero shortcuts in building a platform and products that underpin our mission to democratize private

market investing for customers worldwide. This includes meeting all relevant SEC and IRS requirements, as well as earning our Registered Investment Advisor and Broker-Dealer licenses and approval to operate an Alternative Trading System from FINRA." Multiple investors who received this email then purchased SPV units on Linqto's platform.

102. Sarris knew, or was reckless in not knowing, that it was false and misleading to characterize Linqto as being in "full compliance" and doing business in "full engagement with regulatory agencies instead of spending time trying to avoid them or develop workarounds." Sarris knew, or was reckless in not knowing, that Liquidshares's SPVs had violated and were continuing to violate the Investment Company Act by operating without registering as investment companies, given the advice Linqto's outside counsel had provided on January 10, 2021.

103. On March 10, 2023, California regulators seized a bank that was prominent in the technology industry and placed it under receivership after its depositors reportedly withdrew $42 billion. The bank failure made national headlines.

104. That same day, Endoso and several other Linqto employees discussed sending an email to investors on Linqto's platform to reassure them that Linqto's funds were not with the failed bank. During this discussion, Endoso reviewed and endorsed a marketing email message that was then sent to investors on Linqto's platform. The email reassured investors that their investments were "safe and secure" and further claimed that Linqto had "taken the time and resources to become Federally regulated and compliant, ensuring that we're held to the highest standards in managing your investments." Multiple investors who received this email then purchased SPV units on Linqto's platform.

105. As Endoso knew, or was reckless in not knowing, when he reviewed and endorsed the March 10, 2023 marketing email, it was misleading for Linqto to claim that Linqto had "taken the time and resources to become Federally regulated and compliant." Endoso knew, or was reckless in not knowing, that Liquidshares's SPVs had violated and were continuing to violate the Investment Company Act by operating without registering as investment companies, given the advice Linqto's outside counsel had provided him on January 10, 2021.

106. A reasonable investor on Linqto's platform would have considered these statements about Linqto's purported legal compliance important because if the SPVs were operated in violation of the federal securities laws, that could potentially interfere with investors' ability to realize a return on their investment. Moreover, a reasonable investor in an SPV that held an interest in the securities of Linqto itself would consider statements about Linqto's purported legal compliance to be important because if, as was the case, Linqto was operated in violation of the federal securities laws, that would substantially increase the risk that investors would not realize a profitable return on their investment.

### I. Linqto Collapsed After New Leadership Discovered Sarris's and Endoso's Unlawful Acts

107. In early 2024, Linqto's Board of Directors began engaging in efforts to hire a new CEO to succeed Sarris. On January 2, 2025, Sarris resigned and the Board appointed a new CEO.

108. As the new CEO and other newly hired members of Linqto's leadership team gained access to the company's records and spoke with Linqto personnel, they realized that the company's previous management had knowingly failed to cure extensive and serious securities law violations.

109. In February 2025, Linqto's new management paused the operation of the company's investment platform. On March 13, 2025, Linqto's new management decided to suspend such operations indefinitely, realizing that continued operation of the investment platform would likely exacerbate the company's liabilities. New management concluded that the company could not resume customer-related operations without addressing its past violations and obtaining regulatory approvals to restructure its operations.

110. Ultimately, Linqto's management decided to file for bankruptcy and seek protection under Chapter 11 of the Bankruptcy Code. Linqto and Liquidshares filed for bankruptcy in July 2025, and as of the date of the filing of this complaint, the companies have not yet emerged from bankruptcy.

**J. Defendants Agreed to Toll the Statute of Limitations**

111. Endoso signed a tolling agreement with the SEC that suspended the running of any applicable statute of limitations from August 30, 2025 through May 30, 2026.

112. Sarris signed a tolling agreement with the SEC that suspended the running of any applicable statute of limitations from May 20, 2025 through November 20, 2025. Sarris subsequently signed two additional tolling agreements collectively suspending the running of any applicable statute of limitations further through May 30, 2026.

113. Each of the tolling agreements described in the preceding two paragraphs specified a period of time in which "the running of any statute of limitations applicable to any action or proceeding against [Defendant] authorized, instituted, or brought by or on behalf of the Commission or to which the Commission is a party arising out of the investigation ('any proceeding'), including any sanctions or relief that may be imposed therein, is tolled and suspended." The tolling agreements further provided that Defendants and any of their agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defense."

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

(Sarris and Endoso)

114. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 113.

115. Defendants, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 44 through 77 and 99 through 106, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, knowingly or recklessly:

a. Employed devices, schemes, or artifices to defraud;

b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

116. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

*Violations of Section 17(a) of the Securities Act*

(Sarris and Endoso)

117. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 113.

118. Defendants, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 44 through 77 and 99 through 106, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

a. knowingly or recklessly employed devices, schemes, or artifices to defraud;

b. knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

119. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF

*Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

(Sarris and Endoso)

120. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 113.

121. Linqto, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 44 through 77 and 99 through 106, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, knowingly or recklessly:

a. Employed devices, schemes, or artifices to defraud;

b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

122. By reason of the foregoing, Linqto violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

123. Defendants, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 17-18, 29, 31, 44-77, and 99-106 knowingly or recklessly provided substantial assistance to Linqto's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and unless enjoined, will again aid and abet those violations.

## FOURTH CLAIM FOR RELIEF

*Aiding and Abetting Violations of Section 17(a) of the Securities Act*

(Sarris and Endoso)

124. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 113.

125. Linqto, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 44 through 77 and 99 through 106, directly or indirectly, in the

offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

a. knowingly or recklessly employed devices, schemes, or artifices to defraud;

b. knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

126. By reason of the foregoing, Linqto violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

127. Defendants, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 17-18, 29, 31, 44-77, and 99-106, knowingly or recklessly provided substantial assistance to Linqto's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and unless enjoined, will again aid and abet those violations.

**FIFTH CLAIM FOR RELIEF**

*Control Person Liability for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

(Sarris only)

128. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 113.

129. As alleged in paragraphs 44 through 77 and 99 through 106, Linqto violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

130. At all relevant times, Sarris was a control person of Linqto and, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 17, 29, 31, 44, 48-51, 54-59, 61, 63, 66, 67, 70, 72-76, 100, and 102, was a culpable participant in Linqto's

violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

131. By reason of the foregoing, Sarris is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by Linqto.

**SIXTH CLAIM FOR RELIEF**

*Violations of Section 5 of the Securities Act*

(Sarris and Endoso)

132. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 113.

133. Defendants, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 78 through 84, directly or indirectly, (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; (b) for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities; and/or (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell securities through the use or medium of a prospectus or otherwise.

134. No registration statement was filed or was in effect with the SEC for any of the securities offered or sold by Defendants.

135. By reason of the foregoing, Defendants violated and, unless enjoined, will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and 77e(c)].

**SEVENTH CLAIM FOR RELIEF**

*Aiding and Abetting Violations of Section 7(a) of the Investment Company Act*

(Sarris and Endoso)

136. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 113.

137. Liquidshares's SPVs were investment companies.

138. Liquidshares's SPVs, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 85 through 98, directly or indirectly, (1) offered

for sale, sold, or delivered after sale, by the use of the mails or any means or instrumentality of interstate commerce, securities and/or interests in securities; or offered for sale, sold, or delivered after sale securities and/or interests in securities, having reason to believe that such securities or interests would be made the subject of a public offering by use of the mails or any means or instrumentality of interstate commerce; (2) purchased, redeemed, retired, or otherwise acquired or attempted to acquire, by use of the mails or any means or instrumentality of interstate commerce, any securities and/or interests in securities; (3) controlled investment companies which did any of the acts enumerated above; (4) engaged in business in interstate commerce; and/or (5) controlled a company engaged in any business in interstate commerce.

139. At all relevant times, Liquidshares's SPVs were not registered with the Commission under Section 8 of the Investment Company Act [15 U.S.C. § 80a-8].

140. By reason of the foregoing, Liquidshares's SPVs violated Section 7(a) of the Investment Company Act [15 U.S.C. § 80a-7(a)].

141. Defendants, by engaging in the conduct described above, including but not limited to the actions set forth in paragraphs 85 through 98, knowingly or recklessly provided substantial assistance to Liquidshares's SPVs' violations of Section 7(a) of the Investment Company Act [15 U.S.C. § 80a-7(a)], and unless enjoined, will again aid and abet those violations.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)], and Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### II.

Permanently enjoining Defendants from aiding and abetting any violation of Section 7(a) of the Investment Company Act [15 U.S.C. § 80a-7(a)].

**III.**

Permanently enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by each, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent each from purchasing or selling securities for each of their own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d)(1) and (5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (5)], and Section 42(d) of the Investment Company Act [15 U.S.C. § 80a-41(d)].

**IV.**

Permanently enjoining Endoso from acting as or being associated with any investment adviser, broker, or dealer, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d)(1) and (5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and (5)], and Section 42(d) of the Investment Company Act [15 U.S.C. § 80a-41(d)].

**V.**

Ordering, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], that Defendants are prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**VI.**

Ordering Defendants pursuant to Sections 21(d)(3), (d)(5), and (d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), and (7)], to disgorge all ill-gotten gains, with prejudgment interest, obtained as a result of the conduct alleged in this complaint.

**VII.**

Ordering Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 42(e) of the Investment Company Act [15 U.S.C. § 80a-41(e)].

**VIII.**

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**IX.**

Granting such other and further relief this Court may deem just, proper, and equitable.

**DEMAND FOR A JURY TRIAL**

The Commission demands a trial by jury in this action.

Dated: October 9, 2026

Respectfully submitted,

*/s/ Matthew G. Meyerhofer*
Matthew G. Meyerhofer
Anthony J. Moreno
Jason M. Bussey
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 705-8137
Email: meyerhoferm@sec.gov

*Attorneys for Plaintiff*
*Securities and Exchange Commission*